**The EMPIRE DISTRICT ELECTRIC COMPANY, a corporation, Plaintiff–Respondent,**

v.

**SOUTHWEST ELECTRIC COOPERATIVE, a corporation, Defendant–Appellant.**

No. 18416.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 29, 1993.

Motion for Rehearing or Transfer to Supreme Court Denied Oct. 21, 1993.

Application to Transfer Denied
Nov. 23, 1993.

---

Kerry D. Douglas, Douglas, Lynch, Munton & Haun, P.C., Bolivar, for defendant-appellant.

Gary W. Duffy, Mark W. Comley, Brydon, Swearengen & England, P.C., Jefferson City, for plaintiff-respondent.

GARRISON, Judge.

This is an appeal by Southwest Electric Cooperative (Southwest) from a judgment enjoining it from providing permanent electric service to a Wal–Mart store after the property on which it was located was annexed by the city of Bolivar, Missouri.

Southwest is a rural electric cooperative organized under Chapter 394[1] for the purpose of supplying electric energy in rural areas. The suit was filed by The Empire District Electric Company (Empire) which operates electrical transmission and distribution lines and holds a non-exclusive franchise from the city of Bolivar to provide electric service in that city.

The land on which the Wal–Mart store is located was originally a farm with a house and related farm improvements. The house was later used as a commercial office until the property was sold to Wal–Mart in 1989 and it was torn down. Prior to January 12, 1990 when the land was annexed by Bolivar, it qualified as a "rural area" under § 394.020(3),[2] and had received electric service only from Southwest.

On November 7, 1989, Wal–Mart, in anticipation of the construction of its new building on the property, entered into an Agreement For Electric Service with Southwest and became a member of the cooperative. Between November 8, 1989 and January 10, 1990, Southwest constructed all electrical facilities which would be necessary to serve the anticipated electrical demands of Wal–Mart when its building was completed. Electricity was being provided and billed to Wal–Mart through these facilities as of January 10, 1990. The building was not then complete, however, and the electric service being supplied was single-phase service which was being used during construction, rather than the anticipated three-phase permanent service.

---

1. All references to statutes are to RSMo 1986, V.A.M.S., unless otherwise noted.

2. A "rural area" is defined as "any area ... not included within the boundaries of any city, town or village having a population in excess of fifteen hundred inhabitants...." § 394.020(3).

On January 12, 1990, the Wal–Mart tract was annexed into the city of Bolivar. On the same day, Empire filed its petition seeking a permanent injunction. The petition alleged in part that prior to annexation, Southwest had established temporary electrical distribution to the construction site but had not commenced permanent service, "there being no electrical wiring or appliances within the building under construction to utilize such service"; and it sought to enjoin Southwest from providing permanent retail electric service to the building itself because, it alleged, by taking steps to provide such service, Southwest was attempting to provide electricity to a non-rural area in violation of § 394.080(4). Empire did not question the lawfulness of Southwest's service to the Wal–Mart tract prior to the annexation, nor did it seek to enjoin Southwest from continuing to provide the temporary electric service for construction purposes. The sole contention in the suit was that Southwest was not authorized to convert the temporary single-phase service to permanent three-phase service after the annexation.

The trial court held that Empire, as the franchised supplier of electricity in Bolivar, was entitled to provide the permanent electric service to the Wal–Mart store. In reaching that conclusion, the court applied the "persons at structures" test of §§ 393.106 and 394.315 [3] then in force, and held that since the Wal–Mart store did not meet the definition of a structure at the time of annexation, Southwest was not entitled to provide permanent electric service. Southwest appeals that decision. In the first of Southwest's three points relied on, it argues that the trial court erred in applying the "persons at structures" test of §§ 393.106 and 394.315 rather than § 394.080 in determining whether Southwest was entitled to continue electric service to Wal–Mart after it was annexed. We agree and, accordingly, need not discuss the other points.

■ As in any court-tried case, we review the issuance of the injunction under the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), and will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Ballesteros v. Johnson*, 812 S.W.2d 217, 221 (Mo.App.1991).

Section 394.080 was first adopted in 1939. As of 1990, it provided, in part, that a rural electric cooperative had power:

> ... to ° ... supply ... electric energy in rural areas to its members ... provided, however, that where a cooperative has been ... supplying ... electric energy in a rural area which, by reason of ... its inclusion in a city, town or village, ... such cooperative shall have the power to continue to ... supply ... electric energy therein until such time as the municipality, or the holder of a franchise to furnish electric energy in such municipality, may purchase the physical property of such cooperative located within the boundaries of the municipality, pursuant to law....

The Missouri Supreme Court held that by reason of § 394.080 annexation "did not terminate the power of the cooperative to continue to furnish service to its members within the annexed areas by and through its lines and facilities previously installed...." *Missouri Public Service Co. v. Platte–Clay Electric Cooperative*, 407 S.W.2d 883, 889 (Mo. 1966) (known as *MoPub I*). The court in that case described these "grandfather" rights, saying:

> The cooperative's right to continue service in a municipality served by a franchised utility, after annexation of territory in which it has been lawfully operating, is therefore limited to (1) members receiving service at the time of annexation; (2) persons accepted as members who become subsequent occupants of houses and places of business actually connected to the cooperative's lines on the date of annexation, whether the previous occupants have resigned, moved, or their memberships have been terminated or discontinued for any other reason, and (3) persons to whom memberships predating annexation may be

---

**3.** As indicated later in this opinion, those sections authorized a rural electric cooperative (§ 394.315) and electric corporations (§ 393.- 106) to continue to serve those "persons at structures" which they were serving on August 13, 1986.

transferred in compliance with provisions of the by-laws.

*Id.* at 894.

In the instant case, the trial court found that prior to the annexation, Southwest had constructed all the facilities to serve the anticipated electrical demands of the Wal–Mart store when completed and that as of that date it was providing service. Empire does not appeal that finding. It is undisputed that, at the time of annexation, Wal–Mart was a member of Southwest. Based upon these facts, Southwest would be entitled to continue to provide service to the Wal–Mart store under § 394.080(4) as construed in *MoPub I*. The trial court, however, reached a different result by applying §§ 393.106 and 394.315 and finding that since Southwest was not, at the time of annexation, supplying electricity to a "structure" it was not entitled to provide permanent electric service.

A review of the historical development of §§ 393.106 and 394.315 and the cases interpreting them is necessary. When these statutes were adopted in 1982, they were the same except § 393.106 applied to electric corporations and joint municipal utility commissions while § 394.315 applied to rural electric cooperatives. The original version of § 394.315 provided:

> Every rural electric cooperative shall be entitled to continue to supply retail electric energy to persons at metering points at which service is being provided on August 13, 1982. Notwithstanding any other provision of law to the contrary, no rural electric cooperative shall be permitted or required to supply retail electric energy to any person at a location where said person is receiving, or has within the last sixty days received, retail electric energy from another supplier of electric energy....

Section 394.315 was interpreted in *Missouri Public Service Co. v. Platte–Clay Electric Cooperative*, 700 S.W.2d 838 (Mo. banc 1985) (known as *MoPub IV*). In that case, property being served by a rural electric cooperative was annexed in 1962. In December 1981 the property was purchased by

DeLaval. At the time of the purchase and continuing past August 13, 1982 (when §§ 393.106 and 394.315 took effect) the electricity furnished was a single-phase service to a farmhouse and garage. DeLaval razed the buildings, replacing them with new structures which, beginning in October 1982, were provided with three-phase service by the co-op. The issue was described by the Supreme Court as "whether § 394.315, RSMo Cum. Supp.1984, entitles a rural electric cooperative to provide a new kind of electric service to a unitary tract currently served by the cooperative in an urban area for which an electric corporation has been granted a franchise." *Id.* at 840.

The Supreme Court, in *MoPub IV*, acknowledged that "[a]s the seminal case, *MoPub I* stands for the proposition that a cooperative has the authority to continue to provide service after annexation" under the three-point test announced in that case. *Id.* at 841. The cooperative in *MoPub IV*, however, did not qualify to continue service under § 394.080 because none of the three points of the test announced in *MoPub I* were met in that DeLaval was not a member of the co-op at the time of annexation; the new facilities were not actually connected to the co-op's lines at the time of annexation; and there was no showing that the original owner's membership in the co-op had been transferred to DeLaval. *Id.* The court, however, acknowledged the subsequent enactment of §§ 393.106 and 394.315 and said they "change the law announced in *MoPub I*" and "[t]he application of these statutes, and not this Court's holding in *MoPub I*, determines which of these competing parties may serve the DeLaval facility." *Id.* The court decided that while the co-op was not entitled to continue service based on the *MoPub I* criteria, (interpreting § 394.080) it was authorized to do so under § 394.315 because it was serving persons "at metering points" as of August 13, 1982[4] (the date specified in the version of § 394.315 then in force). *Id.* at 841–842. Section 394.315 was not applied as an exclusive test, nor were its

---

4. The court interpreted the "metering points" proviso as establishing a "unitary tract" theory permitting the co-op to continue to serve the tract of land it was serving as of August 13, 1982, even though it might later be subdivided or improved with additional structures.

terms superimposed on § 394.080 as the trial court did in the instant case.

Following the *MoPub IV* case, §§ 393.106 and 394.315 were amended in 1986. The amendments changed the "persons at metering points" test and instead provided that a rural electric cooperative (as well as electric corporations and joint municipal utility commissions) "shall be entitled to continue to supply retail electric energy to persons at structures at which service is being provided on August 13, 1986." Consistent with Empire's argument, the trial court treated this change as an indication of the legislature's intent to require application of the "persons at structures" test in cases involving the right of a co-op to continue to serve in an annexed area. This argument, in the context of this case, ignores the fact that the amendment was to § 394.315 (and § 393.106) and not to § 394.080. We find no support for this interpretation.

■ Empire states in its brief that the purpose of these statutes was to "prevent customers from switching back and forth between two available electric suppliers to take advantage of rate differences", and "[t]o implement that design the enactments froze existing customers to a particular supplier of electricity as of August 13, 1982...." *See also, Union Electric Co. v. Cuivre River Electric Cooperative,* 726 S.W.2d 415, 417 (Mo.App.1987). These statutes have become known as the "flip-flop" statutes. *Union Electric Co. v. Platte–Clay Electric Cooperative,* 814 S.W.2d 643, 645 (Mo.App.1991). These statutes do not specifically refer to the issue of annexation. Neither § 393.106 nor 394.315 provides that annexation triggers their application so as to prevent a rural electric co-op from continuing, after annexation, to serve a customer it was lawfully serving prior to that time.

In the instant case, the trial court apparently interpreted *MoPub IV* as meaning that § 394.080 and the rules announced in *MoPub I* no longer provided an independent basis authorizing a rural electric cooperative to continue to serve a customer after it is annexed. Rather, it applied the "persons at structures" test of amended §§ 394.315 and 393.106 to the facts as they existed at the time of annexation. In doing so, it found that §§ 393.106 and 394.315 narrowed Southwest's "grandfather" rights under § 394.080 so that it was not entitled to continue service to a customer unless it could show that it was supplying electricity to a structure which existed at the moment of annexation. It found that this test was not met because the Wal–Mart building did not qualify as a structure [5] when annexation occurred.

We disagree with this interpretation and conclude that the trial court erroneously declared and applied the law. We do not interpret *MoPub IV* as meaning that §§ 393.106 and 394.315 are controlling, to the exclusion of § 394.080 when annexation occurs. Section 394.315 is a facilitator in that it provides a basis upon which a rural electric co-op may continue to serve those "persons at structures" it was serving on August 13, 1986. We construe *MoPub IV* to mean that the law announced in *MoPub I* was changed by §§ 393.106 and 394.315 so that those statutes provide another independent basis authorizing a rural electric cooperative to continue to serve its customers after annexation in addition to, rather than as a qualifier of, § 394.-080. Because the Wal–Mart store did not exist on August 13, 1986 and Southwest, therefore, was not providing retail electric service to it at that time, § 394.315 does not apply to give Southwest the statutory right to continue that service with or without the

---

5. Sections 394.315 and 393.106 each contained the following definition:

"Structure" or "structures," an agricultural, residential, commercial, industrial or other building or a mechanical installation, machinery or apparatus at which retail electric energy is being delivered through a metering device which is located on or adjacent to the structure and connected to the lines of an electrical supplier. Such terms shall include any contiguous or adjacent additions to or expansions of

a particular structure which was in existence on August 13, 1986, but shall not include or be construed to apply to non-contiguous additions to or expansions of new structures upon which construction is commenced after August 13, 1986, or to confer any right on a rural electric co-operative to serve new structures on a particular tract of land because it was serving an existing structure on that tract prior to August 13, 1986.

occurrence of an annexation. As indicated earlier, § 394.080 does apply, however. Under § 394.080, the test is not whether Southwest was providing electric service to "persons at structures" but whether Southwest was supplying electricity to Wal–Mart at the time of the annexation. In the instant case, the trial court found that Southwest "had done everything it needed to do to provide service to the Wal–Mart parcel prior to annexation" and was in fact "providing service" at that time.

We acknowledge that there are cases which interpret *MoPub IV* and the application of §§ 393.106 and 394.315 differently. Empire relies on two such cases in its brief. Those cases are *Utilicorp United, Inc. v. Platte–Clay Electric Cooperative*, 799 S.W.2d 108 (Mo.App.1990), and *Union Electric Co. v. Platte–Clay Electric Cooperative*, 814 S.W.2d 643. The trial court in the instant case, in its Findings of Fact and Conclusions of Law, relied heavily on the *Union Electric* case and concluded that, based upon "the law as announced by the appellate courts to the effect that the flip-flop statutes, and the changes therein, evidence a legislative intent to narrow the 'grandfather' rights," it was "forced to the conclusion that because Cooperative cannot show that it was supplying electric energy to a person at a 'structure' at the moment of annexation, that Empire's rights as the franchised supplier inside Bolivar are paramount."

In the *Union Electric* case, a rural electric cooperative provided electricity to a metering device adjacent to a barn on rural property. On April 3, 1989, the property was annexed; the barn was razed on July 17, 1989; and from then until November 15, 1989 the property contained no structure as that term is defined in § 394.315. Beginning on November 23, 1989, the co-op provided electricity for the construction of two new structures and continued to provide power thereafter. As a result of a suit by the electric company holding the franchise from the municipality, the Western District said that § 394.315 limits the "grandfather" exception to § 394.080 and that "... a rural electric cooperative ... is not authorized to supply service to a new structure built on property which has ceased to be in a rural area, pursuant to § 394.080, after August 13, 1986." *Id.* at 648.

Empire also relies on *Utilicorp United, Inc. v. Platte–Clay Electric Cooperative*, 799 S.W.2d 108. In that case, a rural electric co-op began supplying electricity to a supermarket when it was located in a rural area and continued to do so after its annexation into a city. Following annexation, the supermarket commenced construction of a new building which was separate from the existing structure. The court said that if construction of a structure is commenced after August 13, 1986 (the effective date of the versions of §§ 394.315 and 393.106 which are applicable to the instant case) the rural electric co-op was not authorized to provide electric energy to the structure. *Id.* at 111.

Based upon what we have said earlier in this opinion, we do not read §§ 394.315 and 393.106 as preventing a rural electric co-op from continuing to supply electricity to a customer whose building was constructed after August 13, 1986 but whose electric service was lawfully commenced before annexation changed the property to non-rural. Both the *Union Electric* and *Utilicorp* cases are also distinguishable from the instant case because they both seem to interpret § 394.-315 as preventing a rural electric co-op from supplying electricity to a structure built after August 13, 1986. The fact that Wal–Mart's building was constructed after that date is not the theory applied by the trial court in the instant case and would be inconsistent with Empire's contention that the single-phase service to the building under construction was authorized because it began before the date of annexation (but after August 13, 1986).

■ Empire argues there is an important distinction between temporary and permanent electric service. It acknowledges that Southwest lawfully commenced the single-phase service but claims that it had not begun what it calls the "permanent service" (we gather this refers to the three-phase service) at the time of annexation. It cites the following language from *MoPub I*:

... Section 394.080(4) allows an exception due to changed conditions, but the exception is not to be extended by implication

because it runs counter to the spirit and purpose of the chapter as a whole, which does not contemplate the expansion of the cooperative's facilities or the addition of new members or new customers in the annexed areas.

*Missouri Public Service Co. v. Platte–Clay Electric Cooperative,* 407 S.W.2d at 894. The equipment necessary to furnish all of the service, including the three-phase service, was installed and energized as of the time the property was annexed and Southwest was, at that time, supplying electricity to Wal–Mart, its member. This is sufficient under § 394.080 to authorize Southwest to continue that service. The difference between single-phase and three-phase service urged by Empire is a meaningless distinction for these purposes. Both are retail electric energy. It has been held that § 394.315 recognizes distinctions between suppliers of electricity, not between kinds of electricity. *Missouri Public Service Co. v. Platte–Clay Electric Cooperative,* 700 S.W.2d at 842. The same is true of § 394.080.

We conclude that the rights of Southwest are governed by § 394.080, which does not employ the "persons at structures" language of § 394.315. Wal–Mart, on the date of annexation, was a member of Southwest which was receiving electric service. Under § 394.-080, as interpreted in *MoPub I,* Southwest was, therefore, entitled to continue to provide electric service to Wal–Mart.

The judgment of the trial court is, therefore, reversed.

MONTGOMERY, P.J., and PREWITT, J., concur.